of America. Counts are already perceived. Is everybody hear from them? I'm not able to hear them. I'm sorry. Okay. My name is Joan Peppett on behalf of the Fish and Wildlife Service. I'll be sharing my time today with Mr. Tergee from the state of Wyoming, and I would like to reserve three minutes of my time for rebuttal. The purpose of the Endangered Species Act is to take a species that is endangered or threatened and provide extraordinary protection to that species to bring it to recovery. The Fish and Wildlife Service takes that mandate extremely seriously, and for 45 years now, it has poured resources into this species to recover it, and it has created massive amounts of science, and it has spearheaded a conservation strategy involving the state, tribes, and many federal agencies that this court recognized in its previous opinion involving the Yellowstone Grizzlies was a monumental achievement to the benefit of the grizzly bears. The result of all this work over the last 45 years has been that the greater Yellowstone ecosystem grizzly bear no longer meets the definition of a threatened species. Now, before we get into the ways in which the district court found that that wasn't the case, I want to just emphasize that this is how the Endangered Species Act is supposed to work. There can be this misperception that delisting is bad for species conservation, and that is not the case. Delisting is a successful culmination of all of these years of efforts by many governments and other actors to bring the species to recovery. And without the completion of this process, the act does not work. Now... Can I ask you at the outset, I'm having trouble without a scorecard figuring out whose positions are which positions. Sure. The government, as I understand it, the Wildlife Service, only challenges the district court order to the extent that it orders on remand that there be a comprehensive review of the remnants. It wants us to say that that review should be a 4C review rather than a 4A review. No, no, no. A 4C review is a full five-factor review. I got it backwards. 4A rather than 4C. Right? No, no. 4A and 4C both require the full five-factor review of the listed species. But you don't dispute that you need to do further review of the remnants. Correct? Correct. What the service has agreed to do in this case is to do it. Sorry. But we would like you to let the service itself interpret the Endangered Species Act and, if necessary, the Administrative Procedure Act to apply its broad expertise and see how that interpretation would play out in other cases. Okay. Let me just stop you because we can get back to you. But you don't disagree that this should be remanded to the agency to do some sort of review of the remnants? Well, certainly the other appellants have challenged the District Court's opinion in its entirety. If you were to rule in their favor on all issues, then there would not be a remand. But we have not asked... I'm asking for the position of the government. The position of the government is that you don't contest a remand to do further review of the status of the remnants. Correct? We have not appealed to contest that, yes. Okay. And nor do you contest that the remand should remain listed? That is correct. Okay. Yes. Now, with respect, you don't contest the District Court order to the extent that it says you should go back and take another look at recalibration? We have not appealed from that. Okay. So the other part of the District Court order that you contest is the part that finds the rule invalid for failure to consider the genetic sustainability of the Yellowstone District? That's correct. Yes. The District Court held that the agencies had misread the scientific studies and the District Court... Okay. Sure. Now, can I ask you a question about the first part? Because this has consumed me in the last several days looking at this. You think that the remnant should be listed? It is listed. And we think that the remnant should be listed. Your opponents, to the extent that they oppose you, say the remnant is listed and should stay listed? Yes. They may disagree about the process at which you need to arrive at that conclusion. Is there anybody in this case who doesn't think the remnant should remain listed? No, I don't think so. Tell me what we're fighting about if everybody agrees that at the end of the day, no matter what process you use, the remnant should remain listed. What are we fighting about? Well, what we're fighting about is imposing an obligation on the service that is not required by the statute. When the service delists a DPS, which nobody seriously contests that it can do, because the purpose of the DPS provision of the statute is to target more or less protection as needed at specific populations, when it does that, it of course has to do the five-factor review for that species. No, I understand that. I understand you think the district court imposed on you a greater burden on the remnant that you don't oppose than you ought to have. There's five lawyers here today and you all agree that the remnant should remain listed. Should we really care about the process under which you write that? This goes back, I guess, to the D.C. Circuit's opinion in Humane Society, which is factually very different. Because in that case, the DPS that was being delisted was the last actual population of that species in the lower 48 states. Now there's more populations involved, but at the time, the service had found that there was no population outside the two DPSs. The case is quite factually different. There's a lot of briefing and a lot of ink and a lot of argument, but nobody disagrees about the final result. And so I'm trying to figure out whether we really have a controversy over what should happen to the remnant. I thought the controversy was whether or not, I thought the problem was that this report said you have to look at the remnant species in order to determine whether or not this delisting, this delisting is valid. Is that what we're talking about? I'm not sure I could completely understand. But the district court said that we have to do a comprehensive review of the entire listed species in order to determine whether to delist only one segment of it. And we think that's clearly improper. The statute doesn't impose that requirement. Now the service does not object to ensuring that it's not doing an accidental two-for-one delisting. Nobody wants it to be the case that when you delist at EPS, you do a back tour or you just walk into the lot. It doesn't want that. It's committed to doing any necessary review to make sure that doesn't happen. And so the court really doesn't even need to reach that issue, given the service's commitment, except to hold that it doesn't mean you have to do the 4A on the entire lower 48 and discuss food resources in the cell cartegia system. Okay, so that's what the debate is about. I hope we've satisfied you that the court went a little too far. The endangered species act clearly does not require this. And let the service apply its expertise and craft a solution here. And then I can almost guarantee there will be opportunity for additional judicial review in the future. Yeah, I'm sure of that. The point I was trying to make sure I understood was that the controversy here is over the delisting of the segment. Well, that's not a controversy. It's going to affect, we're going to change the delisting of the... Absolutely. The service, even in the rule, said that the rest of the species remained listed. And then in the regulatory review, which is in the Addendum to the Government brief, they said that the lower 48 listing remains a valid listing. So there's no change to that. Now, we've agreed to talk about it in the remand anyway. We think it's really not an issue in this case because there are several occupied populations. So this is factually unlike the Humane Society case. Let's also address the district court's holding on genetics. The district court rejected the agency's finding that this population has sufficient genetic diversity to avoid being threatened by genetics in the future. Interestingly, in the 2007 rule, the same finding was upheld, even when the population was smaller and the... Sorry about my French. The population was smaller and the affected population, the number of population that was breeding, was smaller than two. The difference was that at that time, the service had committed to abate certain to translocate bears from the northern continent into this ecosystem. And in the new rule, they didn't contain that same requirement for translocation by a fixed date. But they did explain why not. There's new science, a genetic study from 2015, that showed that the affected population is actually more than four and a half times bigger than previously thought. It was done with a genetic survey of over 700 bears to determine that this population has a large breeding population. The genetic diversity is slightly up from where it was before. And every indication in terms of litter size, age, reproduction, body form, indicates that this is a genetically healthy species. Reading the two reports, the Miller and Waits report and the Camas report, they both seem to conclude that if the Yellowstone grizzly, if I can call them that, the Yellowstone grizzly remain isolated, that poses a long-term threat to their survival. Do you agree? I'm looking at CDR 407, 410, 422. Does the report say that? No, I don't think they said it poses a threat to their survival in the sense that we mean that in the ESA. I think this population has been isolated the whole time, and it has still had a genetic diversity increase, and it has a very large breeding population. So it's sort of found that it is not threatened, but that the current level would be maintained or enhanced by migration. Okay, so if you get to the migration issue, you rely on state policies, if you will, that say, we'd like to encourage migration if it's needed. Fair? That's one of the things we rely on. There's also a lot of measures. Okay. If migration is needed over the long run, what in this record shows us that there will be migration? Well, first there'll be natural migration, and then there's translocation. Natural migration is part of Montana's management plan, and they have provided some protections in the corridors that connect the Greater Yellowstone ecosystem with the Northern Continental Divide ecosystem, which is to the northwest. Has there been any migration along that corridor in recent years? There has been no actual connection, but these ecosystems keep getting closer and closer and closer. They're closer now than they were at the time the rule was published. They were closer in the 2017 rule than they were in the 2007. And we know that this population is genetically secured for a pretty long time, like 50 years anyway, and possibly a century or so. And so what we don't need is to put a bear in a truck this year, which is what the 2007 plan called for. We can afford to wait and encourage natural migration, which is, everybody agrees, the preferable way, and monitor the population to make sure problems don't develop. And then if it doesn't happen the natural way, then you resort to translocation to back up, which is exactly... Let me just ask that last point. Is there anything in your plan that calls for translocation at a future time? It just says, well, maybe we'll think about it later. Well, no. I think the rule in several places says that translocation... Let's see. This is discussed at... I think it might be 191 of the excerpts of record or 161. These are the places where the general connectivity issue and genetic issues discuss. Nobody really opposes doing it if it's needed. They just didn't think it was needed, and that's the only reason it's not there. So Montana has connectivity as one of its management goals, and the service also favors connectivity, and it will still be managing the northern continental divide ecosystem, so that is not delisted. So there's no reason to believe that that translocation won't happen. It's just that there's no need at this point to intervene artificially when we think it's not really a problem and a natural connection may well develop over the next several decades. I'm not saying it's going to happen this year. The ecosystems do keep getting closer and closer. There's more and more confirmed sightings of bears between them, and it is a realistic finding. The services have reported that. Lastly, I'd just like to address... This court remanded in the 2011 decision the question of whether this population is threatened by the decline of the whitebark pine, and the service complied with that remand. It produced a... The international... Sorry. Interagency Ridgely Bears Study Team produced a report in 2013 that concluded that the whitebark pine decline has had no profound negative effects on Ridgely Bears at the individual or population level, and then there was an additional study in 2016 that came to the same conclusion and also explained that to the extent the whitebark has slowed, that's a function of increased density, as this population fluctuates around its carrying capacity, rather than... It doesn't correlate with whitebark pine good years and bad years. It correlates with density. So, you know, we've complied with that remand. The plaintiffs have alleged that, well, now we have unprecedented levels of mortality and the population is in decline, and the record simply does not support that allegation. The population goes up and down, but within a range that is a recovered population, and there is no decline. It is stable. The population in 2012 and 2017 is exactly the same, 718 bears in the demographic monitoring area. So the service made a rational conclusion based on the evidence and we would ask the court to affirm that. I... Well, I guess we don't have anything... Let me give you a little bit of time for a moment. Thank you very much. Let's hear from your colleague on this side. Hold on just one second. Can't hear you. No, no. Kwame, are you there? I'm here. Mr. Gerda is unmuted. Let's see here. Are we muted on the screen? Okay. Mr. Gerda, can you check to see if your microphone itself is muted on your laptop? Okay, it is not. Okay, we're... Yeah, because we're seeing you and you are unmuted on the system. If you look at the microphone indicator in the lower left-hand corner of your Zoom window, is that showing that it's muted or not? Just give me an up or down because we can't hear you. All right. Let me give you... I'm going to give you a telephone call and I'll give you the telephone information so you can get in over telephone because we are not hearing you at this point. Judge Watford? Yes. Hi. I'm sorry. Did you indicate that you would give Ms. Pepin two minutes for rebuttal? Yes. Let's play on that. Okay. Thank you. Great. Okay. Thank you. Hello, Mr. Jarrett. I'm so sorry. It looks like we are having an issue with your microphone. Here's the telephone number to call to reach our conference. It's 888-273-3658. Judges, Mr. Jarrett has the phone number and he's dialing in right now. Okay. Very good. Thank you. Hi, this is Jeff. Mr. Jarrett, before you continue, can you please mute the volume on your computer? That way we won't hear the audio there. I just muted my volume. Okay. Thank you. We're ready to continue, Judge. Yes. That's perfect. We can hear you just fine, so proceed whenever you're ready. Thank you, Your Honor. May it please the court. I am Jay Jurdy. I represent Appellant State of Wyoming in this appeal and I'd like to reserve three minutes for rebuttal. I'd like to start with the recalibration issue and then, as time permits, talk about translocation, delisting analysis, in that order. I have a question. Are you going to address any jurisdictional issues? If you'd like me to, I can talk about that up front, Your Honor. I'd be interested, too, why you think the intervener has, under the statute, it's not a final order, why you can put aside Article III standing. Just tell me why, statutorily, you have the ability to pursue an appeal that the government's not appealing. Well, Your Honor, with the delisting rule, the effect of the rule when it was issued is it removed preemption of state sovereignty. And so, when the district court sets aside the delisting rule, preemption is reinstated over state sovereignty and it shouldn't be dependent upon whether the United States Fish and Wildlife Service wants to appeal that district court decision. The state's ability to get that reviewed shouldn't depend on the services used on that. Well, let me pose the problem as I see it. This is not a final order under 1292A, 1291, I'm sorry, is it? Because it has a remand. Well, Your Honor, I guess, if the court finds that it's not, then we default to the Altia Valley Act. It's not that there's an exception for the government under our case law that says the government can appeal remand orders to the extent that it would lose the ability to assert its legal position in the absence of that appeal. And that's the exception to 1291 that your friend on the government side is asserting. I'm trying to figure out what exception to 1291 lets us consider your appeal of an order that's not final. Well, Your Honor, as I understand, and I'll refer to Altia Valley, although there are other cases that talk about this, if this court were to find that the federal agency just hasn't appealed, then there's this three-element test that if you can meet all three of the elements, you have a reviewable order. And in this circumstance, in the briefing, we've gone through the three elements of the Altia Valley test. I cited a different case for a simpler proposition, which is if you can't get the relief you're seeking when you go back on remand, you should be able to appeal it. But the effect of not letting the state, the states appeal here, if you find that the federal government hasn't appealed, is to effectively deny them judicial review that prevents them from trying to correct what they believe is an incorrect ruling that's resulting in preemption of their sovereignty. And it's a- I don't understand. I don't understand that. There's going to be a rule here at the end of the day. Everybody agrees on that. The question is how you count the number of bears, recalibration, if you will. And the federal government says, we're willing to take another shot at counting the number of bears. You think they count it wrong, and you can appeal that. I'm tardy. I mean, I know sovereignty is a catch word, but it's hard for me to see what sovereignty you lose by the government adopting a new method of calibration. Well, Your Honor, if the district court is incorrect, let's use the recalibration issue, then the 2017 delisting rule should not have been set aside. And if the 2017 delisting rule isn't set aside, then the states are managing bears. So the service's willingness to go back and try to force the states to do recalibration, recalibration isn't about counting bears. Recalibration is about resetting the annual management population goal if a new population estimator is adopted. I used a shorthand term, but I'm still back. The service says there is no final rule now because the service says, we're happy with a remand to do some more work. So it's not like you have a property interest in the rule. The service has already agreed to a remand to do some more work. They're just arguing about how much. I don't understand how you can't raise the recalibration issue. If you think the service does an improper recalibration analysis on remand, why can't you appeal that? Well, the question on remand would be, does the district court order govern the remand? And I can promise you as a practical matter, if we go back on remand with the district court order not being reviewed, the United States Fish and Wildlife Service will tell the states, you must agree to do recalibration at some unknown point beyond the foreseeable future because the district court said you have to do that. And if you think that's wrong, can you appeal it? Well, what would happen? If we think that's wrong, we would have to say, no, we're not going to do that. In which case the service would say, fine, the listing's not going to move forward. So then the state's option would be to file a petition to delist the grizzly bear population in the Yellowstone segment under the terms and conditions of the 2017 delisting. Okay, so now assume there is jurisdiction. For a moment, tell us why the district court's order on recalibration was wrong. Well, Your Honor, the district court's order on recalibration was wrong because the district court found that adopting a new population estimator without recalibration was a threat that wasn't addressed by the service in the delisting analysis. And it simply isn't a threat for two reasons. The first reason is to be a threat for purposes of a delisting analysis, the problem you're talking about needs to be likely to materialize within the foreseeable future. And with this idea that a new population estimator will be adopted and there won't be recalibration, that's not going to happen within the foreseeable future because the states and the signatories to the conservation strategy have agreed to follow the model average child two population estimator for the foreseeable future. How many years is that? They don't ascribe a specific number of years to define foreseeable future. As they've defined it here, it's the amount of time into the future that they can reliably make predictions without veering into speculation. And so what we have with population estimators is in the preamble to the 2017 delisting rule, the service identified, I believe it was four population estimators including model average child two. And they explained why the other three population estimators aren't best science and won't be best science. And so you're left with model average child two and there's no evidence anywhere on the record to suggest that another population estimator is going to be adopted at any time in the future. I don't think that's correct at all. I think there are strong indications that in the very near future, a new population estimator will likely be adopted. And that's why I was questioning the foreseeable future language that you point to. I mean, that doesn't really count for much at all because in theory, in five years, you all could come along and say, hey, science has changed and we've got much better, much more accurate population estimators. So yeah, foreseeable future has arrived. What do you know? To me, that's why I guess I just don't see the position you're trying to stake out here, especially when it's contrasted with the very strong position that the federal folks took in the lead up. I just don't see how you think you can prevail on this particular point. They basically said, this is just a showstopper. I can't remember all the language, right? We cannot allow this to happen and still be this. And then all you get out of that is, well, for the foreseeable future, whatever that means, two years, five years, 10 years, who knows? And then we can change it without recalibration. That just doesn't seem plausible at all. Well, two things, Your Honor. One, Dan Ash said a few different things, including it's a showstopper. At one point, he said that the listing can't move forward. What he never said was that the ESA required recalibration. He was very careful not to do that. The whole recalibration debate unfolded in front of the Yellowstone Ecosystem Subcommittee because it wasn't an ESA requirement. The service was trying to get the states and the other signatories to agree to it in the conservation strategy because the service couldn't force them to agree to it legally under the ESA. And second, in all of his emails and the other instances where he's quoted, Director Ash never talks about another population estimator that's in the office. There is, I think, a little bit of confusion in the record because there are documents going back to 2012 and 2015 where the mark-resite method was identified. And there was a period of time where everybody involved thought that mark-resite was going to be the replacement for CHOW-2. But it turns out that it's not. And so when you look at the record beyond mark, and take mark-resite out of the equation, the service explained by the other two population estimators they referenced in the preamble aren't best science. And there's just no other evidence in the record, or there's no evidence in the record to show that there's another population estimator in the opting. What there is is a commitment in the conservation strategy to continue working on it. But they would not have agreed to apply CHOW-2 for the foreseeable future if they thought that there was a different population estimator in the opting. And when it was explained by the representative from Idaho to the YES group, he said that by adopting CHOW-2 for the foreseeable future, it doesn't foreclose best science, which basically means they're going to keep working on it. But there is no evidence. I'm sorry. I didn't mean to cut you off. So finish your answer first. There just is no evidence in the record to show that there's any new population estimator that's going to show up any time soon. What's the nature of the state commitment? Is it a intergovernmental agreement? Is it a statute? You say the states, you've agreed to proceed along this way for the foreseeable future. In what way is that a binding agreement? Well, it's in the conservation strategy. And so all three states, stemming off the conservation strategy, they're going to be the ones responsible for counting bears. And they need to do the bear counts every year so that they can manage the population at the level they agree to do it. So my question is, what is it in the law that prevents you from either not doing the count or doing it a different manner if there's a new governor of Wyoming next year? Well, Your Honor, I'm looking for a red. We have a visitor management plan. And I don't have it in front of me right now. But as I recall, we talked about how we're going to use bottle average to do it there. But it really is the conservation strategy that drives it. And to change the conservation strategy, you would have to get the three states and representatives from four federal agencies to agree to make that change. And so there is a check in the conservation strategy that prevents the states from unilaterally deciding anything. Because to get away from bottle average tattoo, you have to change the conservation strategy. And to change the conservation strategy, you have to get it to the agreement of the group. There was one issue you mentioned at the outset you wanted to get time to address. Maybe you can use your remaining time to touch on that. And then I'll give you a couple of minutes for a vote. Yeah, so the court was talking with federal appellants about translocation. And I will say this about translocation. The district court said that there wasn't a regulatory mechanism in place. And then it talked about Montana's commitment to manage the natural connectivity. Wyoming and its grizzly bear management plan has committed to consider recalibration if there's a genetic health issue in the future. Now, that's the most reasonable commitment the state can make as a wildlife manager. Because at this point, we don't know what that genetic health issue might be. But whatever it is, recalibration is going to be part of the state's calculus in determining how to respond to it. In addition to that, in the federal register notice or the preamble for the 2017 delisting rule, the United States Fish and Wildlife Service said that if genetic health becomes an issue at some point in the future, there will be translocation. But it will be done at the last resort. That is a commitment that is consistent with what Wyoming said in its grizzly bear management plan. But also, it's a commitment that you can hold the United States Fish and Wildlife Service and the Park Service to. Because post delisting, while the states will be managing the majority of the bears in the DPS, Yellowstone Park's in the DPS. And we don't manage there. Bears in Yellowstone Park are governed and managed by the Park Service. And so, thank you, John. Thank you very much. Let's hear from counsel for the appellees. And I understand we've got three different lawyers who will address this. Good morning, Your Honor. Can you hear me? Yes. Okay, great. I'm Timothy Presso on behalf of the Northern Cheyenne Tribe appellees, and as the court ordered, I'll be sharing time with Mr. Matthew Bishop and Mr. Robert Aylin. On behalf of the organizational appellees, Mr. Bishop will be addressing the genetic and recalibration issues, and I'll be addressing the issues of jurisdiction and the distinct population segment determination here. I want to begin with the issue of jurisdiction and turn immediately to Judge Hurwitz's question to government counsel, which was, what are we fighting about here? And I think it's absolutely correct to say that we're not fighting with the United States about whether the remnant should be listed, but it goes even farther than that. Because we're also not fighting with the United States as to even whether the Yellowstone distinct population segment should remain listed until the service completes a new rulemaking and a remand process. And that goes right to the heart of this court's jurisdiction over the federal government's appeal, because the government is not contesting the district court's remand and vacature judgment. Instead, it's asking this court, as this court said in the Natural Resources Defense versus Gutierrez case, to essentially line out the parts of the district court's opinion that the government doesn't like. And that's precisely what this court said in Gutierrez that the court lacked jurisdiction to do under Article III's redressability requirements. Here's the government's position. And it gets to the question I tried to ask the government lawyer at the beginning. The government says, look, we don't mind going back and looking at the remnant again. We don't think we need to do all the things the district court told us we needed to do, because it was relying on humane society, which is a very different case. You say, that's probably right. You don't need to do all the things the district court told you to do. But you need to do maybe more than you think you want to do. But everybody agrees at the end of the process, the remnant will remain listed. So what are we fighting about here? Nobody said you need to analyze the remnant to determine its effect on whether you delist the Yellowstone grizzly. That's a separate analysis. They're completely unrelated. And so if everybody agrees that the remnant should remain listed, why don't we just simply order that that occur? Do we have to order the process by which it occurs? Your Honor, I think it's, I don't think it's correct to say that everybody agrees that only the remnant should remain listed. No, I didn't say only. I said everybody agrees that the remnant, whatever the outcome of the rest of the process, the remnant will remain listed as an endangered species. Correct? Correct. All right. So I don't understand all the debate about how we arrive at that process. I understand all the debate about how we arrive at the process of whether the Yellowstone grizzly should be delisted, but I don't understand the debate about the remnant. Well, Your Honor, there's a substantial question, I think, whether the Yellowstone population can be delisted in the way that the government has tried to surgically do it. I absolutely agree. Absolutely agree. There's a substantial question, and we're all going to address that, and it's going to be addressed on remand. But as to the remnant, shouldn't we just say whatever happens to that process with respect to the Yellowstone grizzly, everybody else remains listed? I'm going to pause because I know Judge Schroeder wants to say something. What my understanding is that the controversy is on what effect delisting of the Yellowstone bears might have on the future maintenance of the population, the remnant population. Not its status delisted or undelisted, because it's going to remain listed. But this may have an adverse effect on them, and what is being ordered is that the agency has to take a look at that. But not necessarily do a big analysis that you would need in order to determine whether the remnant would be delisted. Two points in response to that. The first is, I think this is a substantial question, whether consistent with the species definitions of the Endangered Species Act, the service can parse out this particular Yellowstone population without triggering an unintended and disastrous delisting of the remnant. So that question goes to the listing status of both Yellowstone and the remnant. That would be a de facto delisting. That's correct. But the other thing I want to make sure. But nobody's fighting about that issue. That's what you're going to get to fight about when you go back. Well, I think the interveners are fighting very much about that issue. I know the interveners are, but the government's not fighting with you on that issue. Well, I think the government still is fighting with us in a kind of an opaque way. And I would ask the court to look very carefully at what the government says about the nature of the remand that they have accepted. You know, if you look at the Humane Society decision from the D.C. Circuit and the decision below, what you'll see is that the D.C. Circuit was very concerned that the service made a separate finding that the remnant qualified under a definition of either a species, a subspecies, or a distinct population segment. If you look at the government's briefing, on pages 27 and 28 of both their opening brief and their reply brief, they seem to still be resisting having to make that determination. And we've got substantial concern that they're going to keep this remand without some clear direction from this court, perhaps, as an opportunity to essentially more or less say what they said last time and claim there are factual distinctions with Humane Society, which you kind of heard a preview of in Ms. Pepin's comments this morning. And I think there's substantial reason to believe that the government still has not accepted Humane Society, even though it lost or the decision below, even though it purports to have accepted Humane Society. This leads to the dilemma I wanted to ask you about. If you think we don't have jurisdiction over the government's appeal, then we can't give them direction. All they can do is follow the district court. And then they'll come up in two years, having wasted all this time in their view, having conducted a more comprehensive review than they think they need to. And won't be able to appeal it, because having conducted the review, there's no reason for them to want to undo it. So don't they really have jurisdiction to raise that point? Your Honor, you're touching on, I think, the most persuasive thing they have to say in favor of this court's jurisdiction over their appeal. But what I would suggest to the court is the exact same issue was present in the Gutierrez decision. In that case as well, the government had lost on multiple grounds and wanted to appeal only some of them. And the court said, we're not going to line it at the district court's judgment. That meant that the agency's burden to correct its errors was larger than it would have been if this court had taken jurisdiction and reversed on those selected parts of the opinion. But this court nevertheless said, we don't have jurisdiction over the appeal. And I would just suggest if the court found that fair, it applies equally here. But doesn't the effect of that force the government to appeal everything as a formal matter, even though it really doesn't care about some of it? That makes no sense. I understand what you're saying, Your Honor. I will just suggest to the court that that's Gutierrez. The import of Gutierrez goes in the same direction. I don't understand that. Because if the government wants to challenge the scope of what it is required to do, not the reasons why it's been told to do that, which was what was done in Gutierrez. But if here, if the government is trying to challenge the scope of what it is required to do, that seems to me to be something that ought to be reviewable under our case law. Well, Your Honor, I would say it comes back to this principle that we've seen about courts review judgments, not statements and opinions. But I would also... But, Your Honor, even if the court accepts the standing for the government's appeal, I do want to, if the court will permit me, I'll make sure to address the issue of the finality of the judgment as it pertains to the interveners, because I think that's really important here as well. Yeah. The interveners claim an exception from the ALCE rule because they say that the district court required the service to do certain things on remand. If you look at the judgment below, the district court did not require the service to do anything on remand. It simply remanded the rule to the service with a vacater. It's up to the service how to deal with these issues. And it's not enough just to say for the interveners, well, the district court made some negative determinations on what the service had previously done. The same thing was true in ALCE-Valley Alliance with respect to the listing rule at issue there. As this court recognized, the district court decision in ALCE had, as the court put it, walled off certain outcomes that the agency might reach, but still said permutations favorable to the interveners remain. And therefore, the interveners must participate in the remand process and attempt to protect their interests rather than run directly to this court. It's the same thing here. You have limited time, but I want to get to the issue that really I think on your side I want to hear you on. Okay. Assuming there's jurisdiction to address the nature of the review on remand, what should it be? The district court suggested something. Your briefs say, ah, that's probably a little bit too far, but it's a lot like what the district court said. Tell us what the agency should do on remand with respect to this issue. The service needs to consider the impact of the Yellowstone delisting on the remand of the lower 48 original listing, and that impact means both the legal impact in terms of whether the remand remains a species that meets the species definition of the Endangered Species Act, but as the district court said, there's also a need here for a functional analysis of, for instance, impacts on interconnectedness of populations and interbreeding, and we're not saying, and I don't think the district court said, and Humane Society didn't say, that the service has to consider every threat in the world that might exist that affects the remand, but it does need to look at what is changing, and what is changing is we had a unified lower 48 listing. Now we're carving out a piece of that. The only time the service has ever looked at the question whether that unified lower 48 listing met the distinct population segment requirements, which post-date the listing, the service relied heavily on the Yellowstone population to determine that that distinct population segment listing satisfied the Endangered Species Act. Now it's carving out Yellowstone without ever addressing the question whether the remainder can qualify as a distinct population segment with Yellowstone absent. So is this a 4A analysis, a 4C analysis, or something different? I think, Your Honor, it's a 4A analysis informed by essentially 4C's requirement that revisions must be made when the agency makes these determinations. As we showed in the listing comparison on page 26 of our brief, they did make a revision. The revision affected not only the Yellowstone DPS, but it also was a revision of the lower 48 listing. It affected both of those things. Those are now both separately listed entities, or unlisted is what they tried to do with Yellowstone, and they both have to qualify as identifiable species under the definition in the act. The service looked only at the one, the Yellowstone population, not at all at the other. I would say, Your Honor, as well, the interveners, although they mounted a lot of attacks on the way the district court ruled on this issue, none of them has any answer for the question how to avoid the danger that the remnant will be deemed an unlistable entity unless the service undertakes the analysis that the district court requires. I understand the point. I'm trying to figure out what analysis we should tell the district court to do when the government says it told us to do a formal 4A or 4C analysis. We don't think we need to do that. You have a brief that says, gee, we're not sure what the district court said. We don't think it said that, but if you think it said that, it doesn't have to do that. It has to do something else. So I'm trying to figure out how to define. If we're going to take this appeal, we ought to define for the agency what its job is on remand, and I'm still looking for specificity on that. Okay. Two quick points, Your Honor. Number one, I think the government started tilting its phantoms here because the district court used the word comprehensive review, but in context, it's clear what the district court wanted was a review of the impacts of the Yellowstone delisting on the remnant, both as to listability and as to functional effects on grizzly bear recovery in terms of things like connectedness and interbreeding. That's what we're asking for. We think that aligns directly with what the district court was really asking for, and we think the government is sort of making a mountain out of a mole hill by seizing on these two words and trying to suggest the district court imposed a burden that humane society didn't demand, that the plaintiffs never asked for, and the district court really never talked about. Okay. Thank you. If the government did that on remand, you'd be satisfied. I'd love to see what the result they achieved. No, I'm not talking about the result. I'm talking about the process. I think that's the process they need to undertake. Okay. Thank you for your time this morning. Yes, go ahead. But that is not altogether that clear in the district court's opinion. Well, Your Honor, we think it is. Well, I assume you want us to make it clear. What I really want the court to make clear is that the very limited nature of the remand the government seems to have believed it has accepted is not the full scope of what the Endangered Species Act requires, because the government seems still to be resisting the idea that it needs to qualify as a species. And that we think is so central and so important, because somebody can file a petition the moment after the government completes this process and say to the Fish and Wildlife Service, you no longer have a listable species in the rem that you have to delist it, and suddenly populations that are really critically in peril are in further jeopardy because the listing may be killed. And that's what we're really concerned about. I see I'm well over my time. I thank very much to the court for his time this morning. We ask you to affirm the decision below. Okay. Thank you very much. We'll hear next from, is it Mr. Bishop? Yes. Can you hear me okay? Yes, we can. Great. Thank you. May it please the court, Matthew Bishop for Wildlife Guardians, appellees in this case. I'd like to start by responding to the genetic threat issue, the service rate, and then address Wyoming's claim that there's no need for recalibration. On the genetic issue, I want to emphasize right out of the gate that this case is very similar to the previous Grizzly Bear case in that it's not a battle of the expert situation. It's not a situation involving competing scientific studies or even disagreements among biologists from the scientific community. The issue rather is the service's misrepresentation of the science. It's failure to articulate a rational connection between the science it relied on and the conclusion that the long-term genetic threats no longer exist are a problem for grizzly bears in the Yellowstone ecosystem. I guess I read, let me stop you there. I guess I didn't read the government as saying that. I thought the government was saying, look, the short-term threats posed by genetic diversity or lack thereof are not significant. That's what the science seems to suggest. It's the longer term that we're concerned about. And so there's no reason, as we did back in 2007, to have committed to a date certain, you know, nearly a decade out to do translocation. But instead, this is something, you know, 50, 100 years out that we need to be concerned about. And we are committing right now, if it becomes necessary, we will monitor the impact of genetic diversity. And if it becomes a problem because there's not enough natural connectivity, we will use translocation as a backstop. And I guess I don't see what the problem is with that. I mean, they've done as much as one would expect as of today, given what the science tells us. Well, Your Honor, you're right to say that there is no disagreement in this case that we have an isolated population, that in the short term, they're probably doing okay. Both the Miller and Waits paper and the Camas paper are in agreement, and plaintiffs are in agreement as well, that in the short term, and what I mean by short term, Your Honor, is several decades, which is what the scientific literature talks about. Which I assume to be three to four decades, which is not as soon as in the short term, they're okay. The real question here is, are grizzly bears in the Yellowstone region recovered? Meaning, are they threatened in the long term? Because under the statute, you can only declare a species recovered if they're no longer threatened. And if they're no longer threatened, that means they're not likely to become endangered in the foreseeable future. So you're looking out beyond several decades. And that's really the question. And our argument here, Your Honor, is every scientific paper in the record, and every scientific paper they cite to in the preamble of the final rule, if you look closely at ER 116 and 117, which is the genetics section of the preamble, every paper is in agreement that not a single paper has said that they're okay in the long term. Miller and Waite said you're going to need to bring in new genetic material into the Yellowstone region after a few decades. And you could do that either through natural connectivity, which would be the preferred approach, or if that doesn't work, Miller and Waite said, hey, you could truck in grizzly bears, one or two grizzly bears every 10 years. What I'm saying, though, is that that is exactly what the service is committed to doing, isn't it? No, that's what we would like them to commit to, Your Honor. And that's what they committed to in 2007. In the original conservation strategy, they actually took Miller and Waite's recommendations to heart and said, guess what? We're going to aim to restore natural connectivity by 2020. And if we don't, we are committing to translocating one to two bears every 10 years. What's interesting here, Your Honor, is they did not renew that commitment in this decision because the states refused. I thought that's what the district court said they should look at. Right. That's what the agency should look at. That's the difference. It's like in the previous district court case, Judge Malloy relied on that commitment to uphold their genetic analysis. They removed that commitment here. And that's what's problematic. The only commitment they're making with respect to translocation is something that Wyoming said in its management plan. And it was a commitment to only consider doing translocation if they determine at a later date that genetics becomes a problem. There are two problems with that. Considering to do something in the future is not a commitment to do it at all. I know I spend a lot of time at home right now. My daughter, I asked her to enter the dishwasher and she said she'll consider doing it in the future. I think it's very different if you commit to do it as an example. Secondly, Miller and Waits expressly prohibited or recommended against this very approach. On the end of the paper in Miller and Waits, ER 426, they say you can't monitor genetics and then commit to do something because they're so difficult to detect. And we know decreases in genetic diversity are happening now. Anyway, that's why it was so important. But the point I'm trying to make now is that the service at the request of the states no longer took Miller and Waits' recommendation. And right now there is no commitment at all to translocate bears. And that was problematic. And that's what the district court recommended. And I take it the answer, one answer that the government gives, and I'd like you to respond to it, is that, well, the geographic area of the other bears is getting greater over time. Even though we haven't yet arrived at the point where bears are naturally migrating, they might. And then we wouldn't have to translocate. What's your response to that? Yeah. Our hope, Your Honor, I think grizzly bears in Yellowstone are doing better. And things are getting better. And they're starting to disperse out. This is exactly what we want. We want bears moving west into the Selway-Bitterroot and north in the Glacier Park. And they're getting closer. But yet there's still an isolated population. And there's a lot of resistance to restoring natural connectivity. In this case, the record will reveal the service actually recommended that all the states prohibit trophy hunting in the linkage zones, in the connectivity areas. And the states refused. So this decision by itself is going to make connectivity more difficult to obtain. Because dispersing bears as they're leaving the Yellowstone region, which is what we all want, they're the ones who will actually be targeted by trophy hunters. So this decision actually is a step backwards, not a step forwards from our perspective. So your position is that because the bear, the Yellowstone grizzly, is listed as endangered, and because there is a long-term genetic threat, it can't be delisted without the government dealing with that long-term genetic threat in some way. That's right, Your Honor. Because if you went, if the government, if you accepted the government's argument that they're okay for the next 30 or 40 years, almost every species would qualify for delisting under that standard. And the question that Congress was looking at, and the question is, how are they going to be in the foreseeable future for grizzly bears, but a lot of species, like grizzly bears, you've got to go 100 years. And the science is consistent on that point. I'd like to, if I could, let me ask one question before you leave it. If the government's plan was, look, let's monitor for 10 years, and if the long-term threat still exists in 10 years, we'll transport then, or 20 years, would you have an objection to that? One concern we have with that is that I think the whole idea, or the concept of relying on human intervention to get to recovery is inconsistent with the notion that a species of recovery under the statute. And I would direct this court to its earlier decision in the trial eliminated case that suggests that reliance on human intervention and transportation, trucking in grizzly bears from Glacier into Yellowstone, kind of undermines the whole idea of the concept that it recovered. But I don't think we need to get here, get to that point on this case, because like I said before, they didn't commit to translocation. They didn't commit to actually. They just committed to considering it. They said they would consider it if they decided to do so at a later date. Okay. I would like to take my remaining time and address recalibration, if I may. Three points I'd like to make on recalibration. As you addressed, as you mentioned earlier, the service didn't appeal it. They're going to deal with it on remand. All the arguments raised by the states interveners should be raised to the agency on remand. We can participate as well. And there'll be a new decision. Secondly, almost all the arguments made by Wyoming and other states are all post hoc rationalizations. These were not decisions or reasons that were made or proffered by the agency at the time of the delisting. And thirdly, I want to really convey why it's so important to have recalibration. Because how you count bears matters. The CHOW-2 estimate for 700 bears right now and all of the population thresholds that exist in the conservation strategy, mortality limits, are all tied to CHOW-2. It's not so much the number, it's that this is a proxy for a stable, healthy population in the Yellowstone region. And if you go in the future and you decide to change to a different population estimator, which the states, the record does reflect the states are committed and looking at going to a different population estimator, there's a question about that. I would direct your attention to joint experts at 1340, which is the tri-state MOA, where they talk about this after a five-year period. But if you go to a different population estimator, for instance, Mark Reesite, you're jumping automatically overnight. You're going to have, you're going to go from about 700 bears to approximately 1,200 bears. And as Chris Yervine said, the lead bear recovery coordinator, that that's not legally or biologically defensible, because all of a sudden you can kill an extra 500 bears. If that makes sense. How you count bears matters. So they're creating more bears on weeper, even though on the ground, nothing changes. So you've got to have apples to apples. You can't adopt a new estimator and keep the same numbers. And what Wyoming said in their breach was, it's not a problem, because we're always going to manage for 500 bears, or then we'll evaluate re-listing, or we'll manage for 600. But the problem is that that number, that's precisely the problem, because that number needs to change with the population estimator, if that makes sense. Maybe not. Maybe this is too much. What I'm trying to convey to you, Your Honor, is if you're setting a population goal at 647 or 674, using CHOW-2, and you go to a mark-re-site method, you have to change that number, recalibrate with that method. As Chris Servine said, and Director Ash said, and frankly, at the very end of the day, Director Ash said, we will not delist the species unless you commit to recalibration. It's a deal breaker. At the end of the day, the states refused, and Director Ash, and this is all on the record, said, we're going to have to take the best agreement we can get. But the best agreement is not the best available science, and the Endangered Species Act requires that these decisions and the stresses that be made under the best available science not a best agreement they can get. Hopefully they'll fix this and deal with it on remand. If they don't want to do recalibration, the other option is just to continue to manage under CHOW-2, which is certainly an option as well. So with that, I will hand over, and if there are any further questions, I will allow Mr. Ayland to present his issues. Okay, very good. We'll hear from Mr. Ayland. Thank you. Thank you. Good afternoon, Your Honors. I hope you can hear me. I am Robert Ayland. I am appearing pro se today. I have presented six legal claims or issues that are not presented in the other consolidated cases. These issues individually and collectively are dispositive. Dispositive. And due to the dialogue that I've heard so far in the case, that point is even more important. Am I being heard all right? Yes. Yes. I couldn't see you. That point of dispositive nature of these issues is even more important. To go to Judge Hurwicz's point, the search for clarity, there could not be any more clarity if this court decides to take jurisdiction than to affirm the vacatur and not remand. And these issues give that opportunity. Each of the issues I've raised is fully brief, supported by extensive excerpts from the record, and 1028J letters. And I will not repeat all those arguments today. What I'd like to do is present an overview of the issues that I've presented, I've raised. Before doing that, I think it is extremely important for me to first highlight the very critical confessions made by the appellants in this case. Number one, in their responsive briefs, appellants have not challenged even one of the critical facts set forth in my brief. At pages 38 to 33, they can see most facts in their entirety. My experience as a practicing lawyer is that the great majority of cases, the legal issues are finally decided based on the facts. And so I think that should be clear today. Number two, the appellants have raised, at least the federal appellants, an issue of mootness. But they've conceded that argument too, because they've not even argued. They've not even said anything in their briefs about mootness. So that's off the table. Number three, the appellants have conceded that the bearers have not recovered. That's fully briefed by me. But it is not disputed at all in the appellants' briefs. Not at all. That alone should be sufficient to affirm this case without remand, vacate the delisting rule. In fact, Your Honor, what did federal appellants do with regard to recovery once they realized the bearers aren't recovered? As pointed out in my 28J letter dated September 20, 2019, federal appellants simply removed, took it out right in the middle of this litigation, as this litigation is progressing, removed recovery as a delisting factor. By regulation, they tried to change the law. That's what they did. They tried to trade affirmance, which they saw on the horizon. For a longer-term benefit, I guess, by eliminating recovery. That could end the case alone. So, Your Honors, the concessions here are extremely important. They've also, by the way, not answered any one of the 28J letters. Not even one. So what is, sir, what is the bottom line of what you want our mandate to say? Affirm this case here and now by applying the easiest way to get there, Judge Froder, is to apply collateral estoppel. And Mrs. Pepin has invited you to do that. As she said during her argument, she guarantees that this case will be back for judicial review. That's number three. So how many times do they get to do this? Over, over. Four, five, six. We've been through this in the greater Yellowstone. But that was competently litigated and considered by this court. I don't understand. We have a district court judgment that remands the case back to the agency to consider certain matters. Do you want us to affirm that judgment? I want you to affirm the vacatur and find no necessity, no need to remand the judgment. You want us to reverse the district court insofar as it remands? Insofar as it remands only. And to affirm the vacatur. And we're done. We have the finality that Judge Hurwitz, you asked for or you mentioned earlier in this argument. And if you don't like the collateral estoppel, there's always precedential value that greater Yellowstone has. Is greater Yellowstone for naught? I don't think so. It's the same issue. We're doing it all over again. Judge, the district court was under great pressure. Under great pressure created by the states of Wyoming and Idaho by their setting hunting season. Again, last September 1st. Or not last, but September 1st, 2018. And he did a heroic job deciding the case. But that's why we don't have more issues here. He did a heroic job. You have well exceeded your time. I am going to cut you off there. Thank you very much for your arguments this morning. And we will now hear a rebuttal from the government and from the interview. Thank you, Your Honor. I would like to just address two points. Mr. Bishop said that on the genetics issue, the service has misrepresented the science and failed to explain it. You will find the service's explanation on page 117, 160, and 191 of the excerpts of record. He also said that the reason the service no longer required translocation was because the states refused. That is not true. Translocation is not a particularly controversial thing. The only reason it's not required is because the service considered it not necessary given the robust genetic health of this population and the increased likelihood of natural connectivity in the future. So they found that there was no threat to this species from genetics and that they would ensure that that would continue to be the case by monitoring and by using future, you know, encouraging natural connectivity and using translocation. Mr. Bishop's argument that actually you didn't even commit to translocation. You just committed to considering that at some unspecified point in the future. I think the rule is stronger than that on the pages that I cited. Moreover, like I said, nobody wants to let this population fall back into a threatened condition. And so even though the possibility of future listing is never a reason for delisting, it is a reason to believe that people will abide by their commitments, and they're still supporting that proposition. The other thing quickly I want to address about what he said is he said that the state refused to commit to limited hunting in the connectivity corridors. And you'll find that the state of Montana actually set a limit of zero in the connectivity corridors, and all of those connectivity corridors are in Montana. Turning quickly to Mr. Presso's point, I just want to reiterate that the service is making a commitment to consider the impact on the remaining, the rest of the listed species on remand. If we thought that just doing what we'd already done was sufficient, we'd be appealing that issue to you now. This case is in a funny position where a rule came out before the Humane Society decision, and so it doesn't contain the robust analysis that we would like to put before this court. Please, we ask you, let the agency do that analysis. Don't tie its hands with these interpretations that have been urged by the plaintiffs, because they are a very dangerous double-edged sword. They could make it very hard for the service to protect small, vulnerable populations when the overall species is doing well. Let the service... Can I ask you this? If we merely said that on remand you must do the same analysis that the D.C. Circuit said was required in Humane Society, would you object to that? We would like it if the participants say that we must, rather than acknowledging that we commit to, then I would encourage you to say that we must consider the impact of delisting on the rest of the species to ensure that there is not a fact for delisting. In Humane Society, on page, I believe it's 603, they have the better grounds for their decision, I think. So if you were going to rely on Humane Society, I would point you to page 603, where they simply say that you can't delist the species by vulcanization, that the service cannot circumvent the Endangered Species Act by dividing an existing listing into a recovered subgroup and a leftover group that becomes an orphan to the law, that that would be arbitrary and capricious decision-making. Does that mean that you agree that you have to take a look at the remnant to make sure it's a sustainable population? I believe you may have to look at the legal impact of delisting and make sure that it isn't rendered as non-species, non-protectable by the law. There's a lot of ways a service could go about this. It could designate multiple DPSs. Let the service apply its experience and expertise, and then if the plaintiffs don't like it, they will be able to see judicial review. But they have committed to address this issue. We are not just going to say Humane Society is different. If that was the case, we'd be doing it now. I've still not understanding. So does that mean that you're going to take a look at the effect of this delisting and see whether the remnant not merely stays delisted, which of course it will, but whether it's a sustainable population that can be protected? When you say sustainable population, that sounds like a biological analysis, like maybe the 4A analysis. And no, we don't think the service has to do a 4A analysis on the rest of the listed species. It has to consider simply the impact of delisting. The impact of delisting means that the remaining listed species is so small that it can't really exist. Don't you have to look at that? Yes. The service is committing to look at that to make sure that you don't have this sort of backdoor delisting by making the rest of the species into something that can't be protected. And it will look at that. It will look at that. It will look at that. Absolutely. We acknowledge that has to be addressed. Thank you. Before you leave this, and I know we've been here forever, one more point. You don't contest that aside from whatever effect the delisting of the Yellowstone grizzly may have on the remnant of the species, that the remnant of the species otherwise is endangered. Is this a threatened owner? Threatened, that's right. Not endangered, but yes, there's no change to the contradiction of that for the rest of the species. So you're not making any contention that somehow this is an automatic delisting. What we're trying to do is to prevent an automatic delisting. It's always been our position that it is not. So we recognize we have to address that issue. Okay. Okay. All right. Thank you, Captain. We'll hear from Surgeon now. Thank you, Your Honor. I'll be brief. Can you hear me? Yes. I got a pop-up box. I guess maybe you couldn't. So the FLEs, one of the arguments they made in the context of if this court doesn't exercise jurisdiction over the appeal, they argued that the district court ordered it doesn't require the service to do anything on remand. And that argument ignores the way things work in the real world. If this court doesn't exercise jurisdiction in this case, and this matter goes back to the service on a straight remand from the district court order, as I mentioned in the earlier part of my argument, the service is going to take that order and they're going to use it as the roadmap for dealing with the three issues the district court identified in its order. And for two of those issues, they're going to insist that the states either change the conservation strategy or the state regulatory mechanisms. And so it puts the states in this untenable position of the service effectively affirming the district court and forcing us into a decision we shouldn't have to make. The states believe that the district court is wrong on all three issues, and if this court doesn't review those issues, and we go back just on the remand, we're deprived of review forever on those issues. I mentioned earlier the stalemate that would result. We would have to go with the petition to delist, and the review we're going to get on that petition to delist, which will be rejected, I promise you, because they'll use the district court orders and excuse not to grant that petition. The review we'll get on the rejection of the petition is just different than the review we'll get from this court on the issues in this appeal. The other point I'd like to make, the appellee said that they referenced the tri-state MOA, and they said that Mark Reissite may become the next estimator. That's simply wrong. Mark Reissite has been rejected as a population estimator. There are no other population estimators in the office. So if my time draws to a close, we would ask that the court reverse the district court on the three issues raised in the appeal and reinstate the 2017 delisting order. Okay. Thank you very much, counsel. Thanks to all counsel for your very helpful arguments in this complicated case. We very much appreciate it. The case just argued is submitted, and we are adjourned for the day.
judges: Schroeder, Watford, Hurwitz